UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

T.G., Jr., by and through his next friend,
Katrina Greene,                                         Case No. 15-13772

      Plaintiff,                                     Honorable Nancy G. Edmunds

v.

Detroit Public Schools, Karen Kohfeldt,
Monique Edwards, Clover Brown, and Tia
Von Moore-Patton,

      Defendants,
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [35]**

     This matter is before the Court on Defendants Detroit Public Schools, Karen Kohfeldt, Monique Edwards and Tia Von Moore-Patton's Motion for Summary Judgment (docket 35). Plaintiff T.G., Jr., by and through his next friend, Katrina Greene (together "Plaintiff" and/or "TG") filed a response. (Dkt. 39.) The Court heard this matter on November 9, 2016.

**I.    BACKGROUND AND FACTS**

     This suit arises from an incident on October 29, 2013, in which Plaintiff TG came out of his wheelchair and sustained injuries to his face and head while in his classroom at Jerry L. White Center High School (the "Jerry White School"). Plaintiff filed suit on October 26, 2015, against Defendant Detroit Public Schools ("DPS") and the following four Defendants in their individual and official capacities: Karen Kohfeldt, a DPS employee and TG's lead teacher at the time of the incident in question; Monique Edwards, a DPS employee and

teacher's aide at the time of the incident; Clover Brown[1], a DPS employee and teacher's aide at the time of the incident; and Tia Von Moore-Patton, a DPS employee and principal at the Jerry L. White School at the time of the incident. (Compl. ¶¶ 2-7.) Plaintiff brought claims for gross negligence (Count I, Defendants Kohfeldt, Edwards and Brown); substantive due process violations pursuant to the Fourteenth Amendment, 42 U.S.C. § 1983 (Count II, all Defendants); supervisory liability, 42 U.S.C. § 1983 (Count III, Defendants DPS and Moore-Patton); violation of Michigan's Child Protection Law, Mich. Comp. Laws § 722.623 (Count V, all Defendants)[2]; violations of the Americans With Disabilities Act, 42 U.S.C. § 12182(a), and the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) (Count VI, all Defendants); and violation of the Michigan Persons With Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws § 37.1301 (Count VII). This Court declined to exercise supplemental jurisdiction over Plaintiff's gross negligence claim and all claims in Plaintiff's Count I and dismissed Count I without prejudice on November 17, 2015. (Dkt. 3.) In the response, Plaintiff agrees that it will not pursue its claims under the ADA and RA, or its PWDCRA claim. Therefore, the Court dismisses all claims in Counts VI and VII.

TG has had cerebral palsy since birth, with severe physical and cognitive impairments. (Greene Dep. 14, Pl.'s Resp. Ex. A, dkt. 39-2.) On a daily basis, he needs

---

[1] Defendant Clover Brown filed an Answer with affirmative defenses on February 11, 2016, through her attorney Rebecca Hicks. (Dkt. 20.) On August 19, 2016, the Court granted Attorney Hicks' motion to withdraw as attorney for Defendant Clover Brown. (Dkt. 33.) Defendant Brown appeared at the November 9, 2016 hearing to make inquiry regarding the status of the case. The findings and judgment resulting from this opinion and order apply equally to those claims against Defendant Brown, though this motion was not filed on her behalf.

[2] The counts appear to be misnumbered and there is no Count IV.

help with bathing and feeding, and he requires diaper changing. (*Id.*) He is non-verbal, but communicates by vocalizing and laughing, reaching for objects, taking and throwing objects, looking at people and attending to direction. (Kohfeldt Dep. 15-16, Pl.'s Resp. Ex. B, dkt. 39-3.) At the time of TG's mother Ms. Greene's deposition, TG was 17 years old, weighed between 40 and 45 pounds and was approximately four feet tall. (Greene Dep. 11.) At the time of the October 2013 incident, TG weighed approximately 40 pounds and was in the tenth grade. (*Id.* at 11-12, 39.)

TG uses a wheelchair and a stroller. (*Id.* at 15.) When in his wheelchair, he is secured with a lap belt and a harness (also referred to as a shoulder strap). (*Id.* at 16.) TG can unbuckle the lap belt by himself. (*Id.* at 18.) According to TG's mother, he is unable to unbuckle the shoulder strap on his own and "as long as the shoulder straps are strapped on he cannot get out" of the wheelchair. (*Id.* at 18.) If both the lap belt and the shoulder belt are unbuckled, he is able to ease out of the wheelchair and onto the ground by himself. (*Id.* at 18.)

TG has attended the Jerry White School since ninth grade. (*Id.* at 12.) Throughout the ninth grade and at the beginning of his tenth grade school year, he was with teacher Kohfeldt. (Greene Dep. 12, 39-40; Kohfeldt Dep. 12. ) Defendant Kohfeldt has been employed at the Jerry White School for nine years and is a lead teacher. (Kohfeldt Dep. 12.) She teaches severely and multiply impaired students such as TG. (Kohfeldt Dep. 12, 14.) She recalls first teaching TG in September 2012. (Kohfeldt Dep. 12.) The parties agree that prior to the October 2013 incident, Kohfeldt was aware that TG would undo his lap belt. The parties agree that Defendant Kohfeldt and Ms. Greene had discussed both TG undoing his lap belt and the necessity of the belt and harness prior to the October 2013 incident.

Kohfeldt testified that In fall 2012, Kohfeldt contacted TG's mother regarding his undoing the seatbelt and leaving his chair. (Kohfeldt Dep. 23.) Ms. Greene testified that prior to the accident there were a few times where Ms. Greene went in and had a meeting about the harness. (Greene Dep. 38.) Kohfeldt testified that she learned that TG would undo the lap belt all the time and that she passed this information along to her aides. (*Id.* at 26.) The aides to whom she passed this information in 2012 were different than the aides in the 2013 school year, when the incident occurred. (Kohfeldt Dep. 29-30.) In 2013, her aides were Defendants Edwards and Brown. Kohfeldt testified that in 2013 when she saw that TG was still unbuckling himself, she passed the information about unbuckling along to her co-educators again. (Kohfeldt Dep. 30-31.) Kohfeldt stated that TG could unbuckle the lap belt "instantly" but it would take him about a minute to get out of his chair. (Kohfeldt Dep. 54.)

  On October 29, 2013, when TG was in tenth grade in Kohfeldt's classroom, TG came out of his wheelchair and sustained injuries to his head and face. (Greene Dep. 40.) Kohfeldt had left the room at the end of the lunch hour to return a cart to the office and she told her aides that she was leaving, indicating that she would be gone "a couple minutes." (Kohfeldt Dep. 32-33, 39.) She was gone approximately five minutes. (Kohfeldt Dep. 35.) When she returned to the classroom she saw her two aides on the floor, applying ice to TG's forehead and TG was on the floor in a bean bag chair. (Kohfeldt Dep. 35.) TG was crying a little bit and screaming. (Kohfeldt Dep. 35.) Defendant Edwards was one of the aides at the time and she told Kohfeldt that TG fell out of his chair. (Kohfeldt Dept. 36.) Defendant Brown, the other aide, also indicated to Kohfeldt that TG fell out of the chair. (Kohfeldt Dep. 37.) Kohfeldt did not recall if they indicated whether they saw him fall from

4

the chair or saw him after he had already fallen out of his chair. When Kohfeldt returned to the room, the nurse, Pam Joy, was also there. (Kohfeldt Dep. 39.) Kohfeldt observed a knot above TG's right eyebrow. (Kohfeldt Dep. 42.) Kohfeldt does not recall if she made a report or gave a report on the incident and though she thought she may have, she has not seen an incident report. (Kohfeldt Dep. 44.)

Later the same day, Kohfeldt, Brown and Edwards were called to Defendant Moore-Patton's office to review the incident. They met for approximately 15-20 minutes. (Kohfeldt Dep. 58-59.) A Detroit Public Schools Student Accident Report contains the following handwritten statement as the "description of the accident": "Student was fasten (sic) in chair with seat belt there was another student standing next (sic) him when student fall (sic) out his chair in the classroom. There was blood from mouth, nurse and parents was (sic) called time of the accident." (Pl.'s Resp. Ex. D, dkt. 39-5.) A second Accident Report describes the following:

> Student [redacted] Green was sitting in his chair. The safety belt was fastened. I turned around and [TG] was on the floor another student was standing near him. [TG] was on the floor with blood coming from his . . . mouth and a bruise on his head. The school nurse was called.

(Pl's Resp. Ex. D, dkt. 39-5.)

On the day of the incident, Ms. Greene received a call from the school nurse who notified her that TG had a "boo-boo" and had taken off his strap-- the lap belt-- but that he was fine, that they were going to put ice packs on him, and that he had a "little bump." (Greene Dep. 19, 36.) Ms. Greene testified that when he was dropped off by the school bus at the end of the day, she saw the knot on his forehead immediately. (Greene Dep. 20.) Both of his eyes were bruised, the right eye was almost completely shut, the left eye was

5

puffy, and he had a cut on his lower lip. (Greene Dep. 21.) TG's mother took him to the hospital the same day. (Pl.'s Resp. Ex. E, dkt. 39-6.) It took more than a month for the bruising around TG's eyes to go away. (Greene Dep. 21-22.)

Aside from the October 2013 incident and resultant injury, Greene testified that there were other instances where TG's bodily integrity was compromised. (Greene Dep. 38.) For example, since the incident he has come home several times "without his straps" or without being belted. (Greene Dep. 37-38.) TG also kicks off his shoes and takes off his socks, and several times both before and after the incident he was not wearing shoes or socks when he arrived home; they were tied to the back of his wheelchair. (Greene Dep. 38-39.) This has also occurred in the winter. (Greene Dep. 38.) The paraprofessionals (aides) and Kohfeldt are responsible for getting their students ready to go home at the end of the school day, making sure that they have their coats, shoes and socks on. (Kohfeldt Dep 46.) Kohfeldt agreed that TG removed his shoes or socks in the classroom "several times" yet she alleges that she or the paraprofessionals put them back on every time. (Kohfeldt Dep. 47.)

Plaintiff filed this action with this Court on October 26, 2015. (Dkt. 1.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir. 2013) (citation omitted). Furthermore, the "substantive law will

identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation and quotations omitted). When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III. ANALYSIS

### A. Plaintiff's Section 1983 Claims & Due Process Claims (Counts II & III)

#### 1. Plaintiff's Substantive Due Process Claim

Defendant argues that Plaintiff's section 1983 claims against all Defendants must be dismissed where Plaintiff has failed to show a violation of a clearly established constitutional right. "To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988); *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994)).

The parties do not dispute that Defendants were state actors and/or acting under color of state law. Plaintiff relies on the Fourteenth Amendment to argue that the Due Process Clause protects individuals against state intrusions on bodily security and that a public student's right to personal security and bodily integrity is protected by the Constitution. (Pl.'s Resp. 16.)

### a. Conduct That Shocks The Conscience

There is "a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity." *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996). "It is well-established that persons have a fourteenth amendment liberty interest in freedom from bodily injury." *Id.* at 506 (quoting *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987)). "The test for substantive due process claims of this type is whether the conduct complained of 'shocks the conscience' of the court." *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir. 1996)(quoting *Mertik v. Blalock*, 983 F.2d 1353, 1367-68 (6th Cir. 1993)). Conduct that "shocks the conscience" has been described as "brutal, demeaning, and harmful," it is that which amounts to "a brutal and inhumane abuse of official power literally shocking to the conscience." *Lillard*, 76 F.3d at 725 (quoting *Webb*, 828 F.2d at 1158). "Courts have recognized the possibility of deciding that certain behavior does not shock the conscience *as a matter of law.*" *Braley v. City of Pontiac*, 906 F.2d 220, 227 (6th Cir. 1990).

As Defendants point out, Plaintiff has not identified a single case that supports a constitutional violation on circumstances similar to these. Here, there is but a single instance where a wheelchair bound student was injured when he was not properly buckled into his wheelchair, there are further allegations that he has arrived home without being properly harnessed, and that he came home without wearing his shoes and socks. The Sixth Circuit in *Lillard v. Shelby County Board of Education* considered an incident in which a teacher and coach detained the plaintiff/student after class, verbally abused her and slapped her across the face. *Lillard*, 76 F.3d at 719. The Sixth Circuit noted that it was "simply inconceivable that a single slap could shock the conscience" and while the court

8

would "not quarrel with a suggestion" that the teacher's "actions were careless and unwise" they "fall far short of 'brutal,' or 'inhumane' or any of the other adjectives employed to describe an act so vicious as to constitute a violation of substantive due process." *Id.* at 726. The court went on to note that the blow was "neither severe in force nor administered repeatedly." *Id.* "While [the teacher] should reasonably expect to face serious consequences for his treatment of [the plaintiff], those consequences should not be found in a federal court through the mechanism of a section 1983 action." *Id.* at 726. Yet this Court also notes that, unlike the case at bar, the *Lillard* "slap did not result in any physical injury" to the plaintiff." *Id.* The distinction does not sway this Court where there is no evidence of any intentional nor repeated act on behalf of the Defendants in this matter, with respect to the October 29, 2013 incident and resultant injury. Nor is there evidence that the injury was inspired by malice rather than mere carelessness or negligence, at best. *See also Webb*, 828 F.2d at 1158 ("[T]he substantive due process inquiry in school corporal punishment cases must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.").

    The Court finds that the facts in this case do not "shock the conscience." Plaintiff has not presented evidence by which a jury could find that Defendants violated Plaintiff's right to personal security or bodily integrity. Further, there is no other evidence of injury resultant from the alleged instances of TG arriving from the bus without his straps buckled, or allegations that he was sent home without wearing his shoes and/or socks.

### b. Failure To Protect Against Private Violence: Special Relationship and State-Created-Danger

As a general rule, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *See DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 197 (1989). There are two exceptions. First, where there is a "special relationship," and second, where there is "state-created-danger." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998).

With respect to the special relationship theory, Plaintiff argues that there is a special relationship between Defendants and TG which required that Defendants establish policies, practices, procedures and/or customs to protect TG, and that this special relationship was different than a relationship to the public at large because TG had to rely upon Defendants for his care. (Compl. ¶¶ 49-50.) Defendants argue that the "special relationship" argument fails as a matter of law. Defendants rely on *Doe v. Claiborne County*, which noted that "the type of 'special relationship' that makes a constitutional claim viable involves state custody or control." *Doe v. Claiborne Cnty*, 103 F.3d at 510. The *Doe v. Claiborne County* court held that

> Although, clearly, a school system has an unmistakable duty to create and maintain a safe environment for its students as a matter of common law, its *in loco parentis* status or a state's compulsory attendance laws do not sufficiently "restrain" students to raise a school's common law obligation to the rank of a *constitutional* duty.

*Id.* at 510. Neither party has provided authority to the contrary, even where, as here, the student is a special education student with additional physical and cognitive needs. *See also Kincannon v. Detroit Public Schools*, 2012 WL 4854952, at *4 n.2 (E.D. Mich. Oct. 12, 2012) (the plaintiff was a special education student injured by another student, and this

Court cited *McQueen v. Beecher Cmty. Schs.,* 433 F.3d 460, 464, n.4 (6th Cir. 2006), in noting that the plaintiff did not argue that a "special relationship" existed between the student and his school); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995) (Regarding a student who had a seizure on a school bus, the Sixth Circuit held that "Decedent's medical condition and its debilitating effects, . . . were not restrictions imposed or created by the state."). Plaintiff's argument regarding the existence of a special relationship fails.

Plaintiff also invokes the state-created-danger doctrine. "Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *McQueen*, 433 F.3d at 464 (internal quotation marks and citation omitted). To show state-created danger, Plaintiff must show "an affirmative act [by the state] that creates or increases the risk, a special danger to the victim as distinguished from the public at large, and the requisite degree of state culpability." *McQueen*, 433 F.3d at 464; *see also Cartwright v. City of Marine City*, 336 F.3d 487, 491 (6th Cir. 2003).

As to the first element, Plaintiff argues that (1) Defendants failed to monitor TG in the classroom for an extended period of time, resulting in his falling from the wheelchair and sustaining injury; (2) Defendants potentially allowed and permitted another student to undo TG's lap belt and/or shoulder harness, which allowed TG to fall; and (3) Defendants were aware that TG had special and extraordinary needs based on his severe cognitive and physical impairments, Defendants were on notice that TG must wear a buckled shoulder harness and Defendants permitted TG to leave school without shoes or socks, even during the winter. (Pl.'s Resp. 19.)

11

As to the second element, Plaintiff argues that TG's "obvious and significant physical and mental disabilities, combined by the fact that he was being educated in a special education classroom," set him apart from the public at large and put him at specific risk. (Pl.'s Resp. 19.) Here again Plaintiff argues that "Defendants has a special relationship with T.G., and thus had an affirmative duty to ensure his protection and safety, which they failed to do . . . repeatedly." (*Id.*) With respect to the first two elements, Plaintiff does not present evidence to show affirmative steps by Defendants that increased TG's risk of being exposed to a private act of violence.

As to the third element, Plaintiff argues that Defendants knew or should have known "that their actions or lack thereof would have the inevitable potential of endangering and injuring T.G., who was under their direct care during the school day." (Pl.'s Resp. 20.) The Sixth Circuit has clarified this to mean that Plaintiff "must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment." *McQueen*, 433 F.3d at 469. The state's conduct must be egregious such that "it can be said to be arbitrary in the constitutional sense" and "a deliberate indifference standard is appropriate in settings [that] provide the opportunity for reflection and unhurried judgments, but . . . a higher bar may be necessary when opportunities for reasoned deliberation are not present." *Id.* at 469. Even in applying the lower standard, this Court has before relied on *McQueen* to equate "deliberate indifference with subjective recklessness, which means that the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 469; *see also Kincannon v. Detroit Public Schools*, 2012 WL 4854952, at *6.

12

With respect to the third element, Plaintiff identifies no evidence from which a jury could find that the Defendants knew or suspected that the private actor, the "other" student that was near TG after he fell, would have done anything to TG, including unbuckling his lap belt or harness. Plaintiff identifies no evidence of anyone seeing the student having done anything to TG, other than simply being near him, including unbuckling one or more of his straps or belts. Kohfeldt was specifically asked whether there was a female student who she ever saw physically interact with TG and she responded "No." (Kohfeldt Dep. 27.) Furthermore, she had never seen any other student undo the straps on TG's wheelchair, or have any negative physical contact with TG. (Kohfeldt Dep. 27-28.) Plaintiff provides no evidence that shows that Defendants would know or suspect that this other particular student would unbuckle TG's straps. Because Plaintiff has not shown that the paraprofessionals or teachers acted with deliberate indifference, Plaintiff cannot establish that they violated TG's substantive due process rights. There is no underlying constitutional violation by Defendants.

For the reasons set forth herein, Plaintiff's substantive due process claims against Defendants will be dismissed. The Court grants Defendant's motion as to Plaintiff's Count II.

### 2. Whether a Supervisory Employee Can Be Held Liable Under Section 1983

With respect to the section 1983 claims against Defendants DPS and Moore-Patton, Plaintiff argues that they acted recklessly, intentionally, and/or with deliberate indifference and that they practiced and/or permitted customs, practices, and or policies that resulted in these violations of TG's constitutional rights, including failure to supervise, failing to conduct investigations, and/or take affirmative action to ensure students' safety, and failing

to train, supervise, review and/or discipline administrators, teachers and other employees. (Compl. ¶ 61.)

"*[R]espondeat superior* is not available as a theory of recovery under section 1983." *See Doe v. Claiborne County, Tenn.*, 103 F.3d at 507 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). The Sixth Circuit considered the issue of supervisory liability in *Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431 (2002), and affirmed its prior holding that "liability must be based on 'active unconstitutional behavior,' and . . . a mere failure to act [is] not sufficient. In the absence of any allegation that the supervisors had 'participated, encouraged, authorized or acquiesced in' the offending conduct, . . . the supervisors had, as a matter of law, 'neither committed a constitutional violation nor violated a clearly established right." *Id.* at 440.

Plaintiff cites limited evidence from Moore-Patton's deposition testimony in support of his claims. For example, that Moore-Patton admitted in her deposition that she herself does not provide training to teachers and paraprofessionals about monitoring or watching students. (Pl.'s Resp. 12; Moore-Patton Dep. 11, Pl.'s Resp. Ex. C, dkt. 39-4.) Yet none of the evidence cited by Plaintiff shows that Moore-Patton's conduct constituted "active unconstitutional behavior," and much of the evidence on which Plaintiff relies is related to what Moore-Patton knew or did *after* the October 2013 incident and It does not relate to further instances of failure to buckle the lap belt or the wearing of shoes or socks. Plaintiff has shown no evidence from which a jury could find that DPS or Moore-Patton engaged in behavior that was "active unconstitutional behavior," amounted to deliberate indifference to TG's constitutional rights, or "amounted to a tacit authorization of" the constitutional violation alleged herein. *See Doe ex rel. Doe v. City of Roseville*, 296 F.3d at 439-40; *cf.*

*Doe v. Warren Consol. Sch.*, 93 Fed. Appx. 812, 2004 WL 619456 (6th Cir. 2004) (finding supervisory liability and "deliberate indifference" where there was a "widespread pattern of constitutional violations": the supervisor had attended high level meetings where he was shown records of the abusing teacher's purged file, he was sent documents pertaining to the teacher's pattern of abuse, and he was warned that the teacher was unsuited to be around elementary school students; the supervisor acknowledged that the teacher had behaved inappropriately and posed a danger to younger girls). Further, to the extent the Court concludes that Defendants Kohfeldt, Brown and Edwards did not violate Plaintiff's substantive due process rights, this resolves the claims against DPS in DPS's favor. *See Kincannon*, 2012 WL 4854952, at *7.

The Court grants Defendants' motion for summary judgment as to Count III and will dismiss Count III against Defendants DPS and Moore-Patton.

### B. Whether Plaintiff's Official Capacity Claims are Redundant

Plaintiff has named as Defendants the individuals in their official capacities as well as their employer DPS. "A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). Because the Court determines that there is no underlying constitutional violation by Defendants, it need not reach this issue.

### C. Whether Defendants are Protected by Qualified Immunity

Defendants raise qualified immunity as a defense. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Estate of Carter v. City of Detroit*, 408 F.3d

305, 310 (6th Cir. 2005), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009), (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (internal quotation marks omitted)). The Court finds that the Defendants Kohfeldt, Edwards, Brown and Moore-Patton are entitled to qualified immunity where Plaintiff has not produced evidence to show that a constitutional violation occurred and clearly established law does not show that their conduct, with respect to TG falling from the wheelchair on one occasion, TG's arrival home without shoes and/or socks, and TG's arrival home with an unfastened lap belt and/or harness, is a substantive due process violation.

### D. Violation of Child Protection Law, MCL Section 722.623 (Count V)

The Court determines that there was no constitutional violation, and declines to exercise jurisdiction over this remaining state law claim, the alleged violation of Mich. Comp. Laws § 722.623, which provides that certain enumerated individuals, including nurses, school administrators, school counselors or teachers, who have "reasonable cause to suspect child abuse or child neglect shall make an immediate report to centralized intake by telephone, or, if available, through the online reporting system, of the suspected child abuse or child neglect" and shall file a written report as directed in the act. *See* Mich. Comp. Laws § 722.623(a). The Court will dismiss this Count without prejudice.

### IV. CONCLUSION

For the reasons set forth herein, the Court GRANTS Defendants' motion for summary judgment (dkt. 35) and disposes of the remaining claims in this case as follows:

a) Counts VI and VII are DISMISSED;

b) The Court grants Defendants' motion for summary judgment as to Counts II and Count III and DISMISSES Counts II and III with prejudice; and

c) The Court declines to exercise jurisdiction over Plaintiff's remaining state law claim, Count V and DISMISSES it without prejudice.


SO ORDERED.

      s/Nancy G. Edmunds
      Nancy G. Edmunds
      United States District Judge


Dated: November 22, 2016


I hereby certify that a copy of the foregoing document was served upon counsel of record on November 22, 2016, by electronic and/or ordinary mail.

      s/Carol Bethel
      Case Manager